BRYAN v. HUDSON MOTOR CAR CO.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—ACCIDENT-
AL DEATH.

Where a workman standing on a ledge, five feet above
the floor fell through a hole therein to the bottom of
a tunnel 20 feet below, and was dead when picked up,
evidence supporting plaintiff's theory that death was
caused by concussion of the brain due to deceased's ac-
cidental fall, *held*, sufficient to sustain an award of com-
pensation by the industrial accident board under the
workmen's compensation act, although there was testi-
mony from which it might have been found that death
was caused by heart disease; the finding of the board
being conclusive, in the absence of fraud.

Certiorari to Industrial Accident Board. Submitted
October 21, 1921. (Docket No. 158.) Decided March
30, 1922.

Lettitia Bryan presented her claim for compensa-
tion against the Hudson Motor Car Company for the
accidental death of her son in defendant's employ.
From an order awarding compensation, defendant and
the Zurich General Accident & Liability Insurance
Company, insurer, bring certiorari. Affirmed.

*Kerr & Lacey*, for appellants.

*Entenza, Gramer & Ricca*, for appellee.

STEERE, J. At about 4 o'clock in the afternoon of
November 18, 1920, Arthur E. Bryan met sudden
death while working for the Hudson Motor Car Com-
pany as a steam fitter's helper. At the time of his
death he was standing on a concrete ledge about 18
inches wide which was about 5 feet above a concrete
floor covering a tunnel 20 feet deep, engaged with the

On conclusiveness of findings as to what constitutes an "acci-
dent" or personal injury within the meaning of workmen's com-
pensation act, note in L. R. A. 1918F, 877.

steam fitter in drilling eye-beams for brackets to put a pipe on.  He had in his hands a hammer and chisel with which he was doing his work and suddenly fell backwards from the ledge through a hole in the concrete floor about 4 feet square, made for an air shaft, striking the back of his shoulder against the side of the hole as he fell through it to the bottom of the tunnel 25 feet below where he was working.  At the bottom of the tunnel he struck a stooping workman with "just a glancing blow" as the latter stated, further saying, "I don't think it could be his body; I could not swear what part hit me,   *   *   *   just enough to daze me,   *   *   *   not enough to break the fall."  This man was the first one near deceased after he fell and lifted his head from a shallow puddle of water where he lay, noting he was perfectly limp and made no movement.  He was apparently dead when picked up and carried out.

The steam fitter with whom deceased was working when he fell testified:

"I was on the scaffold, about 6 or 8 feet to the left of him, saw him move, and I looked up, and he fell through a hole—through a hole in the concrete floor. I should judge about—well, it wasn't over 4 feet square. *   *   *   I handed him the hammer and chisel, and he dug out the bottom hole, that is about 20 inches below the top hole.   *   *   *   He could reach up.   * *   *   I saw him start to fall, and hollered for him to look out.   *   *   *   I saw one foot right over the hole, and he just dropped right in.   *   *   *   I could not say he was tripping, I just saw him go down the hole.   *   *   *   Well, he was just limp and dropping down through the hole.   *   *   *   Well, he was just falling when I saw him."

The witness also stated that deceased made no outcry nor raised his arms and fell backwards off the ledge.

Deceased was a single man 49 years of age, living with his mother, Lettitia Bryan, in Detroit and support-

ing her, as she claimed. On January 21, 1921, she made application under the employers' liability law for compensation as a total dependent. This was opposed by defendants and the provided proceedings therefor were had under the law, resulting in an arbitration hearing at which an award was made to plaintiff as a total dependent of $14 per week for 300 weeks, from which defendants appealed to the industrial accident board and a hearing had at which the award was affirmed.

Defendants' claim was and is that deceased died from an acute attack of heart failure coming upon him while at his work, as the culmination of an advanced and active syphilitic myocarditis with which he had been afflicted for some time, or in other words that he suddenly died from disease while at his work and his body dropped from the ledge through an opening to the bottom of the tunnel; and that there is no competent testimony in the case upon which the industrial accident board could base its conclusion that death resulted from the fall or award compensation for injuries received in an industrial accident.

After hearing the testimony of the two eye-witnesses who saw the beginning and end of the deceased's fall from the ledge where he stood at his work to the bottom of the tunnel where his dead body was picked up and the testimony of medical experts as to the cause of his death based on a *post mortem* examination the board said and found in part as follows:

"The story of this event, as told by Folwell, reveals a typical picture of a man stepping backwards and sideways into a hole. For this reason, we think that Bryan stepped into the hole accidentally and did not fall into the hole as a result of sickness or the body fall in following death. It should be borne in mind that at the time of the alleged accident Bryan had been working steadily as usual; that he was facing the wall; and that the hole through which he fell was

more or less back of and to one side of where he was working."

That plaintiff was wholly dependent upon deceased for support at the time of his death is not controverted in the brief of defendants' counsel.

An examination and autopsy of the body was ordered by the coroner and held at the morgue that evening by Dr. French, the medical examiner of Wayne county, such examination being one of his official duties. Drs. Morse and Crump, medical expert witnesses for defendants, were permitted by him as a matter of professional courtesy to participate in the examination and Morse to perform the autopsy. Dr. French made an official report of the autopsy at its conclusion which he produced at the hearing and identified. Portions read by him from it when testifying are as follows:

"This is the report of autopsy on the body of Arthur Bryan, held at the Wayne county morgue in the city of Detroit, on the 18th day of November, 1920, between the hours of 9 and 10 p. m. 'The body was that of a male; color, white; apparent age, forty-nine; * * * height, five feet ten inches; apparent weight, 170 pounds. Marks and deformities, none * * * Nutrition, good * * * Location and description of wounds, there was a deep lacerating wound of 1½ inches long, in the scalp, exposing skull, two inches above inion.' In other words it was on the back of the head, here (indicating). * * * 'Cerebral edema and engorgement.. Hemorrhoid.' The cause of death, as ascertained at the time of autopsy, was 'Probable shock, following concussion of brain.'

"*Q.* So then, at the autopsy, you concluded that the cause of death was a concussion of the brain?

"*A.* A shock, following concussion."

Sections of the brain and heart were taken away by Dr. Morse for examination. He and Dr. Crump, called as witnesses for defendants, testified that from microscopic examinations of the parts taken in con-

nection with what appeared at the autopsy, their diag-
nosis and conclusions were that deceased was not killed
by the fall but "there was a sudden death, from sudden
heart failure resulting from syphilitic myocarditis.
The man was dead when he started to fall."

It appears undisputed that deceased had been
troubled with indigestion for some time and occa-
sionally suffered acutely from it, particularly after
a hearty meal. Folwell, the steam fitter who saw him
fall, testified deceased had been working steadily with
him as helper for 8 or 9 weeks and he had seen him
have spells of distress after a hearty meal when he
would put his hand in the region of his heart and
claim he had eaten too much, sometimes complaining
of his heart, but "more of indigestion than anything
else." Dr. McVoy, a general practitioner of 12 years'
experience whom deceased had visited at his office and
been treated by several times, testified that his troubles
were hemorrhoids and constipation with auto-intoxi-
cation; that not long after November 8th he had made
a rectal examination and at the same time also ex-
amined his heart very carefully, using a stethoscope
and, aside from a little irregularity due to the auto-
intoxication, found nothing wrong, and in his opinion
deceased had no organic trouble of the heart. Plain-
tiff stated deceased had supported her for about 8
years, and his married brother, who said he saw him
often, testified that while he was troubled at times
with and complained of indigestion if he ate too
heartily, or certain kinds of food, he made no other
complaint and they had no knowledge of his suffering
from heart trouble.

In the course of Dr. French's examination he testi-
fied in substance that from the pathologist's micro-
scopic report he thought the diagnosis of Drs. Morse
and Crump as to the cause of death was correct, which
defendants urge explains and in effect nullifies his

official report as to cause. The expert opinion testimony of these three physicians is not in all respects in perfect harmony. Dr. French testified that when they removed the calvarium of the skull during the autopsy there was "a great deal of edema, and there was a blood-shot condition of the arterioles and the meninges." Asked if that could be caused by concussion of the brain he replied in part:

"Yes, it is quite possible, certainly it is—traumatic cerebral edema, and hemorrhage. I have described that in my definition of concussion, when we started out, after we begun. That was checked up and ruled out by the microscopic examination."

Dr. Morse, who made the microscopic examination, testified that the general condition of the brain "is the best evidence it was not due to concussion.". Dr. French saw the general condition of the brain before he made his official report which showed "nutrition good," a "deep lacerating wound" in the back of the head through the scalp "exposing the skull" on the outside, and on the inside "cerebral edema and engorgement," the probable cause of death being "shock, following concussion of the brain." That evidence was in the case for the board to weigh, also the testimony of Dr. McVoy who made a professional examination with a stethoscope of deceased's heart not many days before his death and found no organic trouble, together with all the circumstances attending the death.

As heretofore frequently noted, only questions of law are reviewable by this court in these proceedings. There was competent legal evidence produced by plaintiff tending to support the industrial accident board's findings as to the cause of death, and to sustain its award. The board was acting within its statutory powers, and, in the absence of fraud, its findings of

fact, supported by competent evidence, are made conclusive.   In such case, this court cannot weigh the evidence or disturb the findings.

The award is therefore sustained.

WIEST, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.   FELLOWS, C. J., did not sit.

The late Justice STONE took no part in this decision.